**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re:* | Chapter 13 |
| FRES WILLIAM OQUENDO, | Case No. 19-04127 |
| *Debtor.* | Hon. Janet S. Baer |
| FRES WILLIAM OQUENDO, | |
| *Plaintiff,* | Adv. Pro. No. 19-106 |
| v. | |
| GLOBAL SPORTS MANAGEMENT, GmbH, POW SPORTS ENTERTAINMENT, INC., SQUARE RING, INC., HITZ ENTERTAINMENT CORPORATION, DAVID DIAZ and THE LAW OFFICES OF LEON R. MARGULES, P.A., | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGEMENT
MOTION OF GLOBAL SPORTS MANAGEMENT, GmbH**

Defendant Global Sports Management GmbH ("Global"), pursuant to Local Rule 7056-1 and Rule 56 (c)(2) of the Federal Rules of Civil Procedure (the "Rules"), made applicable hereto by Federal Rule of Bankruptcy Procedure 7056, hereby submits the following memorandum of law (the "Memorandum") in support of the *Motion of Global Sports Management, GmbH for Summary Judgment* (the "Motion").[1] This matter has already been adjudicated in a proceeding

---

[1] All undefined terms herein shall carry the meanings ascribed to them in the Motion or the *Local Rule 7056-1 Statement of Undisputed Material Facts of Global Sports Management, GmbH* (the "Fact Stmt." or "Fact Statement"), which are filed concurrently herewith.

1

before the body with jurisdiction, to wit the World Boxing Association ("WBA"), with findings adverse to Oquendo. This was after Oquendo was granted full due process.

## PRELIMINARY STATEMENT

The Debtor is a professional boxer. He claims to be entitled to funds which Global placed in an escrow account in connection with potential payments if a boxing match between the reigning champion, Manuel Charr, and the Debtor were to occur. That arrangement was the subject of two written contracts – a "Heads of Agreement" ("HOA") and "Escrow Agreement"[2]. Those very contracts demonstrate that the Debtor cannot state a viable claim to the Escrowed Funds.

It was Oquendo who declined to honor the HOA and who has ignored the terms of Escrow Agreement. In fact, *Oquendo himself* defeated any claim he might have had to part of the Escrowed Funds by refusing to sign a local bout contract with Global, as the Heads of Agreement required him to do. And that is not just Global's gloss on the facts. The WBA, which sanctions professional boxing matches, passed a formal resolution in March 2019 expressly finding that the Debtor "will not sign the bout contract," and the Debtor's refusal to do so was "the most recent impediment" to the fight happening. Even if the Debtor had prudential standing to enforce the Heads of Agreement (which he does not), he has frustrated that contract's performance and the facts clearly demonstrate that.

Global is entitled to Summary Judgement, for these reasons and those set forth below.

---

[2] These agreements are Exhibits 1 and 2 to the PCE Declaration, which in turn is attached as Exhibit A to the Fact Statement.

# ARGUMENT

## The Legal Standard for Summary Judgement

Rule 56 (c)(2) provides that summary judgement should be rendered if the pleadings and disclosure materials on file, along with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgement, the facts must be viewed in the light most favorable to the non-moving party "only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts … [and] where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 586-587 (2007) (internal citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for Summary Judgement; the requirement is that there be no issue of no *genuine issue* of *material* fact." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247-248 (1986) (Emphasis in original). Put more colorfully, "summary judgement is the put up or shut up moment in a lawsuit, when a party must show what evidence it had that would convince a trier of fact to accept its version of events." *Diadenko v. Folino*, 741 F.3d 751, 757-768 (7th Cir. 2013).

As demonstrated below, there is no issue of material fact which would defeat summary judgement. The claims of Oquendo fail for numerous reasons.

**Point 1**

**Oquendo Is Bound By the Determination of the World Boxing Association**

The opinion in *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019), is directly on point.

The facts in *Wilder* are more complicated than in this case, and there were claims and counterclaims, including a defamation count. However, the base facts are very similar to those here. In *Wilder,* there was to be a World Title Bout between then Champion Deontay Wilder and Alexander Povetkin. Wilder was promoted by a Company called DiBella Entertainment, LLC and Povetkin was Promoted by a company called World of Boxing, LLC (WOB). The contract was, on behalf of WOB, negotiated by John Wirt, Esq., the same attorney who negotiated on behalf of POW here. There, as here, there was a large sum placed in escrow pending the bout. Not long before the bout was to take place, Povetkin tested positive for a substance known as Melodium, a prohibited substance. The bout was postponed so that the WBC could review the matter. Thereafter, there was a dispute over whether the bout was cancelled or postponed. There was actually a trial in which a jury found that Povetkin had ingested Melodium. The WBC subsequently issued a decision that, despite the jury finding, it would not find the Povetkin had ingested Melodium at a time when it was banned.

The Wilder parties contended that the WBC did not have discretion to decide whether Povetkin had violated the Bout Agreement. The Court, however, ruled that the Agreement between the parties ceded to the WBC the right to cancel or postpone the bout. Once the WBC cancelled the bout, the contract could not be read to also impose an obligation on the World of Boxing to stage the bout.

Turning to the Heads of Agreement here, the authority of the WBA is clear. Charr was to comply with the "WBA's rules prohibiting the use of performance enhancing drugs. . . ." HOA ¶ 1. Officials were to be appointed in accordance with the Rules of the "Bund Deutscher Beruboxers" (the local Commission) and the WBA. The officials were to be chosen by the WBA. HOA ¶ 3. Perhaps most significantly, in the event the bout was "prevented from taking place by an act of God, fire, flood, or any other cause beyond the direct and immediate control of GSN . . . then the WBA shall decide whether to postpone the bout , in which case the provisions of this Agreement will remain in full force and  effect and shall apply to the rescheduled date of the Bout". HOA ¶ 5 (emphasis added).  The Escrow Agreement also provided that disbursement of the escrowed funds "shall also be subject to the direction of the WBA or BDB." Escrow Agreement ¶ 6.

Shortly before any WBA Championship bout, a short form agreement was required to be signed. Oquendo is chargeable with knowledge of this. Paragraph 14 of the short form agreement reads "In the event of a disagreement or controversy regarding this Agreement, Boxer and Promoter shall submit same to the WBA for determination with a fee to be determined by the WBA. The parties agree to be bound by the rules and decisions of the WBA regarding any such disagreement or controversy."[3] *See, e.g.,* WBA Form Contract, Ex. 9 to PCE Decl, attached as Ex. A to the Fact Stmt. Entering to a standard bout agreement was required. HOA ¶ 2.

Here there was a long administrative process at which all affected parties were represented. The WBA made its ruling. Fact Stmt. ¶¶ 13, 14, 15; *see* PCE Decl. ¶¶ 11 through 14.

---

[3] Global is aware that Oquendo never signed the WBA form contract but bout contracts of this nature are usually signed shortly before a bout.  Oquendo knew he had to sign for the bout to take place.

Just as the WBC has "substantial discretion" to render appropriate rulings in the *Wilder* case, so did the WBA here. The WBA ruled that its resolution calling for the Charr stripping should be rescinded and the bout between Charr and Oquendo should proceed. Fact Stmt. ¶ 16. The Heads of Agreement at paragraph 5 expressly stated that in such a case "<u>the provisions of this Agreement will remain in full force and effect and shall apply to the rescheduled date of the Bout</u>." Fact Stmt. ¶ 5; *see* Ex. 1. To PCE Decl. (HOA) ¶ 5 (emphasis added). Global attempted to do just that, tendering a rescheduled date and bout contracts to Oquendo. Fact Stmt. ¶¶ 20-22, 25. Oquendo made the choice not to proceed. Fact Stmt. ¶ 26.

Oquendo has no claim against Global or the escrow holder on the escrowed funds. It was he who declined to proceed with the postponed bout, not Global. As the counsel for the WBA has attested, the attorney for Mr. Oquendo informed the WBA that "Mr. Oquendo declined to proceed under the terms of the original contracts which had been filed with the WBA and that he requested a purse bid. However under resolution 201903 061702 that request was denied and he was removed as the mandatory contender.'" Fact Stmt. ¶ 43; *see* Mack Decl. at Ex. 3. Mr. Oquendo did not request reconsideration of the Resolution, and therefore waived his right to have the Resolution Reconsidered or appealed. Fact Stmt. ¶ 18; Mack Decl. ¶ 14.

Oquendo wanted to fight for the WBA title. He was bound by the Rules and Rulings of the WBA. The WBA, after hearing from all parties, ruled in favor of Charr that the test on which Oquendo takes so much stock was invalid. Just as the Courts (District Court and Second Circuit ) declined to second guess the ruling of the WBC in the *Wilder* case and found that Wilder was bound by those rulings, Oquendo is bound by the rulings of the WBA. He has no claim on the

escrowed funds.[4] Numerous cases hold that judicial reinterpretation of a sporting group's determinations is disfavored. *See NFL Management Council v NFL Players Association*, Lexis 7404 (2d Cir. 2016) (the Brady case), *Crouch v. National Association for Stock Car Auto Racing, Inc.* 845 F.2nd 397, 303 (2d Cir 1988); *Koszela v National Association of Stock Car Racing, Inc.* 646 F.2nd 749, 745-759 (2d Cir. 1981); *Charles O. Finley v. Kuhn*, 569 F.2d 527, 536-538 (7th Cir. 1978); *see also Major league Baseball Player's Association v Garvey*, 532 U.S. 504, 509 (2001).[5]

The rulings of the WBA must stand.

**Point 2**

**Global Had no Control Over Charr**

The role of a promoter in the simplest terms is that it contracts with fighters (or their own promoters), contracts with a site, contracts with television, and stages the bouts, hopefully but not invariably having more income than expenses. Fact Stmt. ¶ 34; *see* Trendelkamp Declaration, ¶ 4. This is the role which Global played with respect to the anticipated bout between Mahmoud Charr and Fres Oquendo, scheduled for September 29, 2018. *Id*.

Fighters are what in the United States would be called independent contractors. They are responsible for the details of their own training and responsible for their own nutrition. Global was not the trainer for Mahmoud Charr nor did it supervise his nutrition or supply him with

---

[4] The Court should note that Oquendo filed an action against the WBA in the Northern District of Illinois docket number 1.21-cv- 00270. Exhibit 15 to PCE Decl. The docket sheet reflects that a motion to dismiss is pending. There is one paragraph of the Complaint complaining that on a number of occasions Oquendo was bypassed by the WBA. A motion to dismiss is pending according to the docket sheet.

[5] Garvey resolved an arbitrator's award. Global submits that, in providing due process to all parties and rendering rulings, the WBA was operating as an arbiter. *See generally* Chaffee, The Internal Affairs of Associations, Not For Profit, 43 Harv. L. Rev. 903, 1031.

7

supplements. It certainly never supplied any Performance Enhancing Drugs to Mr. Charr. Fact Stmt. ¶ 36; Trendelkamp Decl. ¶ 6.

Even assuming that Mr. Charr had ingested a Performance Enhancing Drug (PED) (an assumption the Court cannot make), Global had no involvement. It certainly would not have been within its control. Fact Stmt. ¶ 37; *see* Trendelkamp Decl. ¶ 7.

Paragraph 5 of the HOA provides, in pertinent part, as follows: "In the event the Bout is prevented from taking place by reason of God, fire , flood, riot, war public disaster or any other cause beyond the direct and immediate control of GSM [Global], then the WBA shall decide whether to postpone the bout, in which event the WBA shall decide whether to postpone the Bout  in which case all the provisions of this Agreement shall remain in effect and shall apply to the rescheduled date of the bout." (Emphasis added).

There will be no proof submitted – because there is none - that Global had any control over substances which Charr is alleged to have taken. As set forth above, the managing Director of Global has explained the role which it played and it had no role in the training of Charr or his supplements. Fact Stmt. ¶ 36; *see* Trendelkamp Decl. at ¶¶ 4-9.  The WBA determined to postpone after hearing all the facts rather than cancel the bout. Fact Stmt. ¶ 16, 18. Thus paragraph 5 controls.

It is true that the Heads of Agreement stated at paragraph 1 that "POW shall cause Oquendo to comply, and GSM will cause Charr to comply with the WBA's rules regarding the prohibiting the use of performance enhancing  drugs and the WBA Fair Boxing Program  that is administered by VADA". The rules provided for testing and also, as set forth in Mr. Mack's Declaration, provided for the right to appeal any adverse finding. (The WBA styles it as a request for reconsideration, but is the same thing). Global complied completely by requiring VADA

8

testing. That was the extent of its obligation. It was not a guarantor of the conduct of Mr. Charr and that was clearly not the intent of the provision. The "WBA Fair Boxing Program Rules" were adhered to by Global by requiring, contracting and paying for testing. That was the end of its responsibilities. No one can guarantee the conduct of a third party. To interpret the contract otherwise is, simply, nonsensical and contracts and contracts should not be read in a way which is illogical. A court must avoid interpreting a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectation of the parties." *In Re Lipper Holdings*, 766 N.Y.S. 2d 561 (2003), *quoted by SPCP Group, LLC v. Eagle Rock Field Services, LP,* 2013 WL 359650 (S.D. N.Y. 2012). Global fulfilled its responsibilities by following the requirements for drug testing.

Oquendo has no claim against Global or its funds held in escrow.[6]

## Point 3

**Oquendo Has No Claim On the Escrowed Funds as He is not a Party to Any Agreement So Entitling Him[7]**

It is black-letter law that "one who is not a party to a contract may not recover for its breach." *Nat'l Cash Register Co. v. UNARCO Indus., Inc.*, 490 F.2d 285, 286 (7th Cir. 1974). Any right to payment to the Escrowed Funds must flow from the contract which created that right, which is the Heads of Agreement. But that agreement is *only* between Global and POW; the Oquendo is not a party to it. Instead, the Debtor simply executed a "ratification," undertaking that he "would render all services necessary to enable GSM [Global] and POW to comply with

---

[6] Notably, Oquendo has sued the WBA but not Charr. Fact Stmt. ¶ 45.

[7] This point is similar to a point made in a motion to dismiss. The Court ruled that the complaint survived under Rule 12 (b)(6) standard. The Court now need not accept the assertions of the Complaint on their face and can assess the entire factual context.

9

their respective obligations," and critically, he agreed "to look solely to POW for full payment of any amounts due." (PCE Decl., Ex. 1, Heads of Agreement, ratification.)

The only exception to the latter was the Oquendo entitlement to a $50,000 purse which was payable only *if* the Bout went forward, *and if* he had entered into a local bout contract that POW had approved. PCE Decl. Ex. 1, ¶ 2(a)(i). Those conditions were never satisfied: the Bout never happened because, as the WBA found, the Oquendo refused to sign a bout agreement. Fact Stmt. ¶¶ 26 and 34; *see* Mack Decl. ¶ 14 and Ex. 3 thereto. Hence, it is completely clear that the Oquendo lacks standing to enforce the Heads of Agreement, and has no claim to the $50,000 purse.[8]

Nor can Oquendo enforce the HOA on a third-party beneficiary theory. Qualifying as a third-party beneficiary to a contract operates as an exception to the requirement that only a person in privity may enforce the agreement's terms. *See, e.g., Dean Street Capital Advisors, LLC v. Otoka Energy Corp.*, No. 15-cv-824 (RJS), 2017 WL 476720, at *4 (S.D.N.Y. Feb. 2, 2017) (applying New York law).[9] Proving third-party beneficiary status requires that the contract terms "clearly evidence an intent to permit enforcement by the third party in question." *Hillside Metro Assocs., LLC v. JPMorgan Chase, Nat'l Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014). Put another way, "a non-party to a contract that does not contain unambiguous language manifesting an intent to make the non-party a beneficiary of that contract lacks prudential standing to litigate issues relating to that contract." *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr.

---

[8] And because *the Debtor's own conduct* is the reason he has no claim to any of the Escrowed Funds – a fact he studiously failed to reveal to the Court – the Debtor could not recover under the HOA in any event. *See, e.g., Osinoff v. Opera Sols. LLC*, No. 14 CIV. 1408 (DAB), 2017 WL 5900297, at *4 (S.D.N.Y. Nov. 14, 2017) ("Conduct of a party to a contract which frustrates and prevents performance by the other party constitutes a breach on the part of the former and excuses performance by the latter.") (internal quotation marks omitted). See *Point 4, supra*.

[9] The Heads of Agreement contains a New York choice-of-law provision. PCE Decl., Ex. 1 at ¶ 8, last sentence.

S.D.N.Y. 2018) (collecting Second Circuit cases).[10] In fact, third-party non-beneficiaries cannot enforce a contract "even when that third party's financial interest is arguably at stake." *Id.* at 341 (citing cases).

These principles illustrate why the Debtor cannot state a claim as a third-party beneficiary of the HOA. The HOA lacks *any* language – let alone unambiguous language – manifesting an intent by the contracting parties, Global and POW, to confer enforcement rights on the Debtor. In fact, the opposite is true. The ratification signed by the Oquendo is clear that, should he consider himself entitled to funds under the Heads of Agreement, the Debtor "agree[d] to look *solely* to POW for full payment of any amounts due for all rights granted and services performed" by the Debtor pursuant to that contract. (PCE Decl. Exhibit 1 at p. 5 (emphasis added)).

The only exception to that provision would be triggered in the event that the Debtor had earned the $50,000 purse by actually competing in the Bout, which the Debtor himself prevented from happening, as discussed above. Fact Stmt. ¶¶ 26 and 27; *see* PCE Decl. Ex. 5., Mack Decl., ¶ 14. Consequently, even though the Debtor's financial interests are arguably at stake in the HOA, the absence of the requisite unambiguous language conferring direct enforcement rights on him means that he cannot state a claim for breach of that agreement as a third-party beneficiary. *Motors Liquidation*, 580 B.R. at 349 (citing cases).

Finally, even though the Debtor is party to the Escrow Agreement, that contract is not actionable. The Escrow Agreement is made subject to the Heads of Agreement, such that the former does not have the effect of superseding the latter. (Ex. 2 to PCE Decl., Escrow Agreement, ¶ 14.) Recitals A and B of the Escrow Agreement state that there was a prior

agreement – i.e., the Heads of Agreement – between Global and POW providing that funds be placed in escrow. Recital C states that the Oquendo Parties "have reached agreement as to the allocation and distribution of the Escrowed Funds among the Oquendo Parties." This distribution was, under the plain language of the Escrow Agreement, an apportionment by the Oquendo Parties *of monies due POW* – not the Debtor – under the HOA. (PCE Decl. Ex. 2, Escrow Agreement, Recital B.)

The Escrowed Funds would only be distributed to the Oquendo Parties "[u]pon the conclusion of the Bout" (PCE Decl. Ex. 2, Escrow Agreement, ¶ 3), but, as discussed above, the Bout never happened. The Bout was instead postponed. In that circumstance, the Escrow Agreement is clear that the Escrowed Funds would be payable "upon the occurrence of the rescheduled Bout. . . ." (PCE Decl. Ex. 2, Escrow Agreement, ¶ 5.) The Heads of Agreement further provided that it was up to the WBA to decide whether to postpone the Bout, and that the Heads of Agreement would remain in effect if it did so. (PCE Decl. Ex. 1, Heads of Agreement, ¶ 5.) POW has made no claim on the Escrowed Funds, nor does the Debtor allege in his Complaint that POW has done so. The WBA ultimately determined that the Bout should go forward, but when the Debtor declined to execute a local bout contract the WBA stripped him of the right to the next bout with Charr. Fact Stmt. ¶ 27; *see* Mack Decl. ¶ 14.

Consequently, the Escrow Agreement's various provisions about what would become of the Escrowed Funds upon conclusion of the Bout were simply never activated, so the Oquendo cannot state a claim under that contract, either.

**Point 4**

**Oquendo is Not Entitled To the Escrowed Funds As a Result of His own Conduct**

Oquendo's own conduct is the reason the bout was prevented. "A Party which frustrates and prevents the performance by the other party constitutes a breach constitutes a breach by the former and and excuses performance by the latter." *See, e.g., Osinoff v. Opera Sols. LLC*, No. 14 CIV. 1408 (DAB), 2017 WL 5900297, at *4 (S.D.N.Y. Nov. 14, 2017). A party to a contract cannot rely upon a failure to perform a condition precedent (in this case, the promotion of a bout) where the party has precluded that performance or where the party has prevented the occurrence. *MHR Capital Partners v. Preestock, Inc*. 12 NY3rd640, 646 (2009); *ADC Orange, Inc. v. Coyote Acres*, 7 NY 3d 490 (2006).[11]

This case is no longer at the pleadings stage. The evidence submitted with this motion shows that Global made efforts to schedule this bout.

Once the WBA ruled, Global fixed on April 6 in Germany. Statement of Undisputed Facts, para. 19; Trendelkamp Decl. Counsel for Global was responsible for working with Oquendo's promoter, POW, to finalize the paperwork necessary for the bout to take place. He liased with John Wirt who is both an attorney and a principle of POW. Fact Stmt. ¶ 20; PCE Decl. ¶ 18.

On February 11, 2019 Global, through counsel, sent a form WBA bout contract to Oquendo's promoter. Exhibit 7 to PCE Decl.; Trendelkamp Decl. ¶ 11; Fact Stmt. ¶ 21. Such a contract must be filed with the local commission (the norm in boxing and provided for in the Heads of Agreement as noted prior in this Memorandum). *Id.* The form contract was modified in that mandatory drug testing was required, per the WBA directive. *Id*.

---

[11] As noted earlier, New York law applies.

After the bout agreement was sent, Oquendo sent a text to Mr. Charr (not his promoter) demanding more than twice the money provided for in the underlying contract. Fact Stmt. ¶ 22; *see* PCE Decl. Ex. 11. Also Oquendo had a long retired Fighter reach out to the WBA in his behalf. *Id*. Consequently, Counsel for Global set a deadline for signing for February 15. *Id.*

Rather than sign the bout agreement Oquendo filed for bankruptcy at roughly the same time he was being declared in default. Fact Stmt. ¶ 23; *see* Ex. 9 to PCE Decl.

Upon learning of the filing counsel for Global telephoned Mr. Wirt, counsel for POW. Mr. Wirt was extremely upset and expressed same in the strongest of terms since clearly Oquendo was seeking to void his contract with POW. After considerable venting, Mr. Wirt released counsel for POW gave permission for Counsel for Global to deal with Oquendo's personal attorneys to attempt save the bout. Fact Stmt. ¶ 24; PCE Decl. ¶ 22.

Global's counsel sent an email to Oquendo's attorneys stating that the bout could still proceed if the issue was POW's participation and Global's counsel then sent a bout contract to Oquendo's personal counsel eliminating any reference to POW, suggesting Oquendo's dispute with POW could be resolved in bankruptcy. Fact Stmt. ¶¶ 21, 25; *see* Ex. 10 to PCE Decl. (email exchange); Ex. 11 to PCE Decl. (form contract); Trendelkamp Decl. ¶ 12.

Mr. Oquendo's counsel responded that he deemed the contracts invalid and that Oquendo wished a new purse bid. Fact Stmt. ¶ 26; *see* Exhibit 12 to PCE Decl. He also informed Counsel for the WBA that Oquendo would not be proceeding. Fact Stmt. ¶ 27; *see* Mack Decl. ¶ 14 and Exhibit 3 thereto.

Mr. Oquendo's position is akin to the defendant who stands in the dock having murdered his parents, pleading for mercy because he is an orphan. Mr. Oquendo had every opportunity to proceed with a postponed bout against Charr. Had he done so he, and his promoter, would have

been entitled to the funds in escrow. By making the choice not to go forward he foreclosed that opportunity. The consequence lay solely upon his own shoulders.[12]

Notably, at some points in this litigation Oquendo has asserted that Mr. Charr never passed a drug test. That is flatly untrue. Believing himself to be innocent, Mr. Charr requested a retest from VADA, the same collection agency as took the original sample. Coincidentally, that sample was taken on the same day as his fight with Oquendo was scheduled, September 29, 2018. The sample taken on September 29 showed that he was clean of performance enhancing drugs. Fact Stmt. ¶ 29; *see* Charr Decl. ¶ 11.

Charr enrolled in the WBA Clean Boxing Program which was a program in which fighters agree to random drug testing. Charr has since learned that the WBA program was discontinued, though he does not know when that was. Fact Stmt. ¶ 29; *see* Charr Decl. ¶ 13.

When the attempt was made to reschedule the Oquendo bout, provision was made in the contracts for VADA random drug testing. Charr knew of and agreed to this provision. Fact Stmt. ¶ 30; *see* Charr Decl. ¶ 14.

After the Oquendo bout fell through, Charr was scheduled to fight a boxer named Trevor Bryan. Those contracts called for random drug testing. A sample was taken by VADA on January 17, 2021, and it showed that he was negative for any performance enhancing drugs. Fact Stmt. ¶ 30; *see* Charr Decl. at ¶ 15.

Thus, at no time had Charr been reluctant to engage in any drug testing. Fact Stmt. ¶ 30; *see* Charr Decl. ¶ 16.

---

[12] Global is aware that under the cases cited in this brief, Global could have filed a breach of contract action against Oquendo. Given Oquendo's lack of resources, the determination was made that it was not worth it to do so.

Global sets this forth because of prior assertions by Oquendo as to why he did not proceed with the rescheduled bout. Yet the assertion that Charr never passed a drug test is a complete fiction and that therefore Oquendo therefore was excused from proceeding is complete fiction.

**Point 5**

**The Terms Of the Escrow Agreement Have Been Adhered to By Global and the Escrowed Funds Should be Released to It**

Under the Escrow Agreement the funds held were to be released "Upon the conclusion of the Bout." Exhibit 2 to PCE Decl. The escrow agent was to hold the funds "In the event any regulatory agency or the WBA requires that all or a portion of the funds be withheld." *Id*. The escrow agreement further provided that "if the bout between Oquendo and Charr does not take place as currently scheduled and the Bout is not rescheduled pursuant to paragraph 5 of the HOA , Global will provide a certification to the Escrow Agent that the Bout has been cancelled" and the Escrow returned to Global. Global took no action to have the escrowed funds returned while there were proceedings before the WBA specifically because the bout had not been cancelled and there was anticipation by Global it could be rescheduled. Fact Stmt. ¶ 15; *see* PCE Decl. ¶ 16. That anticipation bore fruit when the WBA withdrew its suspension against Mr. Charr, reinstated him as Champion, and directed that the postponed bout proceed. Fact Stmt. ¶ 16; *see, e.g.,* Mack Decl. ¶ 10.

When Oquendo refused to proceed and he was declared in default of the contract the necessary Certification was in fact submitted to the Escrow agent. For the reasons set forth in this memorandum, and because the process set forth in the Escrow Agreement was scrupulously followed by Global, the Escrow Agent should be permitted to release the funds back to Global.

**Point 6**

**Mr. Oquendo's Filing Was Fraudulent**

Global has had the benefit of taking Mr. Oquendo's deposition. He was candid as to the reason for filing the bankruptcy. He volunteered, "Well I had to file bankruptcy in order to sever my relationship with John [Wirt] because he was one day my promoter and one day my attorney." T-60.6, Exhibit 15 to PCE Decl.; Statement of Undisputed Facts at par.44.

Global asks the Court to recall that at the time of the filing, Mr. Oquendo had the opportunity of going forward with the Charr bout and garnering a great deal of money. Trendelkamp Decl. at ¶¶ 10 and 11. PCE Decl. at ¶¶ 19-23; Exhibits 1 and 2 to PCE Decl. He had the option of doing just that and fighting about his obligations to John Wirt and POW in a separate non bankruptcy action.

Bankruptcy courts do not look kindly on boxers who use the bankruptcy courts for the purpose of evading their obligations under personal services contracts when they stand to make large sums of money. *See In re Jack*, 471 B.R.252 (Bankr. D. Nev. 2012); *In re Sammons*, 210 B.R.197 (N.D. Fla. 1997); *In re Waldron,* 785 F.2d 936,939 (11th Cir 1986).

At the time of this filing Oquendo was not in financial distress because by going forward to fight Charr his immediate financial problems would have been alleviated. He simply wanted to get out of a contract. He calculated that by reneging he could get out of any obligation to pay POW and others out of the escrowed funds and that the WBA would cause a new purse bid. He made a bad decision but that decision was his alone.

In *In re Carrera* , 64 BR 156, 160 (Bankr. C.D. Cal. 1986), the court held that it would be inequitable to allow a debtor to allow a debtor to file for bankruptcy where the primary purpose to reject a personal services contract  where the debtor's major motivation was to be able to

perform under a more lucrative contract. This was the underpinning of *In re Jack, In re Waldron,* and *In Re Sammons*, cited above.

Moreover Oquendo seems to be trying for a double recovery (not that he is entitled to any). He has sued the WBA in District Court for "skipping" him over. Statement of Undisputed facts, ¶ 45 and Exhibit 16 to PCE Decl.

Oquendo tried a grift here. The Court should, we respectfully suggest, see through it and dismiss his claims on the escrowed funds.

## CONCLUSION

For all of the forgoing reasons Mr. Oquendo has no claim on the funds held in escrow. Global respectfully submits that summary judgement should be granted to Global and that the funds held in escrow be released back to it.

Dated: July 25, 2022                                    Respectfully submitted,

                                                        Global Sports Management GmbH

                                                        By /s/ David R. Doyle
                                                              One of its attorneys

Robert M. Fishman
David Doyle
Cozen O'Conner
123 Wacker Drive, Suite 1800
Chicago, IL 60606
Phone: (312) 382-3154
rfishman@cozen.com
daviddoyle@cozen.com

Patrick C. English
Dines and English L.L.C.
685 Van Houten Avenue
Clifton, NJ 07013
Office: (973) 778-7575

LEGAL\58803770\2

## CERTIFICATE OF SERVICE

David R. Doyle, the undersigned attorney, hereby certifies that on July 25, 2022, he caused the foregoing MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGEMENT MOTION OF GLOBAL SPORTS MANAGEMENT, GmbH to be served on the following individuals through the Court's CM/ECF electronic noticing system.

/s/ David R. Doyle

- **Paul M. Bach** paul@bachoffices.com, pnbach@bachoffices.com;bachecf@gmail.com;bachlaw@stratusbk.com;bachpr57277@notify.bestcase.com
- **Penelope N Bach** pnbach@bachoffices.com, bachecf@gmail.com;paul@bachoffices.com;bachlaw@stratusbk.com;bachpr57277@notify.bestcase.com
- **David R Doyle** daviddoyle@cozen.com, david-doyle-7943@ecf.pacerpro.com
- **Robert M Fishman** rfishman@cozen.com, robert-fishman-9859@ecf.pacerpro.com
- **Richard N Golding** rgolding@goldinglaw.net
- **David J Scriven-Young** dscriven-young@pecklaw.com
- **John S Wirt** jwirt@wirtlawfirm.com, pcwirt@wirtlawfirm.com

LEGAL\58803770\2